# EXHIBIT G





EARNEST WAYNE POWELL

    Plaintiff.

v.

CIGNA PROPERTY AND CASUALTY
CO., et al.

    Defendants.

Civil Action Number 3:99CV857

## MEMORANDUM OPINION

THIS MATTER is before the Court on the Defendants' Motion to Dismiss or, in the Alternative, to Stay Judicial Proceedings and Compel Arbitration. For the reasons discussed below, the Motion is DENIED in part and GRANTED in part:

1. The Motion to Dismiss is DENIED; and

2. The Motion to Stay Judicial Proceedings and Compel Arbitration is GRANTED.

### I. Background

This case concerns allegations of wrongful termination on 2 grounds: (1) unlawful age discrimination; and (2) unlawful discrimination on the basis of military service. Plaintiff and Virginia resident EARNEST WAYNE POWELL (herein "Powell"), an attorney and Army Reservist, was employed at all relevant times as an attorney in the Legal and Public Affairs Division (herein the "L&PA Division") of Defendant INA, an insurance company whose principal place of business

is in Philadelphia, Pennsylvania. (Compl. §§ I(A)(1), (B)(1.); Defs.' Mem. § III(A).). Defendant CIGNA is also based in Philadelphia, but shares INA's Richmond office; it appears to be a subsidiary of INA. (Compl. § I(B)(1).). Defendant RANDALL HOVE (herein "Hove") was CIGNA's Senior Vice President, Chief of Litigation, and head of the CIGNA Field Litigation Organization at all relevant times. (Id. § I(B)(2).). Defendant GERARD A. GILBRIDE (herein "Gilbride") has been a CIGNA Area Vice President for the area covering Richmond since April 1, 1998. (Id. § I(B)(3).). Defendant HAROLD A. MACLAUGHLIN (herein "MacLaughlin") has been a CIGNA attorney and managing attorney of CIGNA's Baltimore staff counsel office since the mid-1980's. (Id. § I(B)(4).).

The L&PA Division adopted a policy in 1994 which called for the arbitration of all employment-related disputes. (Defs.' Mem. at "Factual Background" § III(A).). Powell was working in Richmond at the time, having opened an INA Field Litigation Office (herein a "FLO") in Richmond on or about February 21, 1991. (Compl. § II(3).). The exact nature of Powell's activities is a point of contention between the parties, and is discussed below in Section III. Defendants state that Powell received two copies of the arbitration policy as revised: one by interoffice mail on August 21, 1996 accompanied by an explanatory cover letter, and one sent to his home address. (Defs.' Mem. § III(A).). The arbitration policy states the following:

> In the interest of fairly and quickly resolving employment related disagreements and problems, and applying the important public policies expressed in the Federal Arbitration Act . . . [the L&PA Division's] policy is that arbitration by a neutral third-party is the required and final means for the resolution of any serious disagreements and problems not resolved by the Division's internal dispute resolution processes. Both the Division and the employee will be bound by any decision made by a neutral arbitrator. If the employee or the Division do not abide by the arbitrator's

2

decision, either party may go to court to enforce the arbitrator's decision, but arbitration must be used before going to court. This policy is intended to prevent an employee from going to court over employment related disputes; it is not intended to take away any other rights.

(Id. [alterations new].). This language is similar to language included within the *L&PA 1998-1999 Human Resources Handbook* (herein the "L&PA Handbook"), which Powell and all other L&PA employees received via interoffice mail in or around June of 1998. (Id. § III(B).). Powell confirmed his receipt of the L&PA Handbook by signing an acknowledgment on or about June 12, 1998 which stated that he is "responsible for knowing the policies and information" contained therein. (Id.). All L&PA employees also received a copy of the *You and CIGNA* handbook (herein the "CIGNA Handbook") in or around July of 1998; the CIGNA Handbook states that the arbitration policy "is intended to substitute final and binding arbitration, which is quick, inexpensive and fair, for going to court, which is slow and expensive." (Id. § III(A).). It states also that

> [t]he agreement to arbitrate applies to serious employment-related disagreements and problems, which are those that concern a right, privilege or interest recognized by applicable law. Such serious disputes include claims, demands or actions under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Civil Rights Act of 1991, the Equal Pay Act, the [ADEA], the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the Rehabilitation Act of 1973, the Americans with Disabilities Act, the Family and Medical Leave Act, and any other federal, state or local statute, regulation or common law doctrine, regarding discrimination, conditions of employment or termination of employment.

(Id. § III(c) [alteration new].).

Events allegedly occurring during the fall and winter of 1998-1999 are central to this case. Powell claims that he learned in October of 1998 that the Defendants were interviewing an attorney

3

much younger than himself at the same time they were considering his proposal to continue to perform legal work in Richmond after the planned closure of the Richmond FLO. (Compl. § IV(6).). Powell reports that the Defendants did not respond to this proposal. (Id.). Powell claims also that he was instructed to transfer his existing files to INA attorneys in Virginia who happened to be younger than he, or to CIGNA's Baltimore staff counsel office, despite Powell's greater experience in handling those files. (Id.). Powell was notified in mid-November of 1998 that his job in the Richmond FLO would be eliminated soon, and that he would receive severance pay if he signed an "Agreement and Release" (herein the "First Agreement"). (Id. § IV(4).). Powell met with Hove in Philadelphia on December 4, 1998 to discuss these events, as well as Powell's belief that the Defendants were communicating derogatory information concerning his work performance to in-house and outside attorneys. (Id. § IV(7).).

The Richmond FLO was closed on or about December 31, 1998, reportedly as part of a corporate downsizing and reorganization. (Id. § II(7).). Powell was discharged on this date, along with six other employees in the Richmond FLO. (Id.; Defs.' Mem. at "Factual Background" § I.). Powell was 48 at the time of discharge. (Compl. § II(8).). Powell reports that he then sent Hove a fax outlining his "requirements to resolve the matters existing between the parties." (Id. § IV(10).). Powell reports further that Hove phoned him on January 6, 1999, to say that those requirements — which appear to have constituted amendments to the First Agreement — were acceptable, except for a requested monetary settlement. (Id. § IV(11).). Nevertheless, Powell signed the First Agreement on January 7, 1999; what transpired in connection with this signing is in dispute, and thus is discussed further in Section III below. (Id. § IV(13).). The First Agreement states in part that

4

> no charge, complaint, claim or lawsuit of any kind shall be filed in
> connection with any claim released by this Agreement and Release
> against Employer, its successors, parents, subsidiaries, affiliates,
> incorporated and unincorporated, past and present, and each of them,
> as well as its and their directors, officers, agents, servants and
> employees, and each of them . . . .

(Ex. A to Compl. at 3, ¶ 5(a).). The First Agreement acknowledges also the full and complete satisfaction of

> any and all claims, demands and causes of action of whatever kind
> or nature whether known or unknown to or suspected or unsuspected
> by Employee, which Employee now owns or holds or has at any time
> owned or held against any Releases arising out of or by reason of
> Employee's employment or termination of employment. This [Agreement]
> includes but is Not limited to claims under the [ADEA].

(Id. at 3, ¶ 5(b) [alterations new].). An additional relevant First Agreement provision states that any disputes as to the First Agreement, Powell's employment or his termination would be "resolved exclusively by arbitration in Richmond, Virginia in accordance with the Employment Dispute Resolution Rules of the American Arbitration Association, as modified by Employer . . . ." (Id at 4, ¶ 9.). The First Agreement was the first of two such releases submitted to Powell; the second (herein the "Second Agreement", which is described by the Defendants as merely the first release plus a minor amendment) arrived by mail at Powell's residence while he was on active duty in the Army Reserves. (Compl. § IV(14).); Reply § I(A)(1).). Defendants report that Powell received $40,838.44 after signing the Agreement. (Defs.' Mem. at "Argument" § I.).

Powell filed a charge with the EEOC alleging age discrimination on or about May 3, 1999. (Compl. § II(11).). Though he does not state so expressly, it appears that Powell received a Right-to-Sue Letter from the EEOC on September 27, 1999. (Id.). Powell filed the instant Complaint on December 27, 1999, in which he brought causes of action both for unlawful age discrimination in

5

violation of the Age Discrimination in Employment Act (herein the "ADEA"), 29 U.S.C. § 623(a)(1), and for a violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 (herein the "USERRA"), 38 U.S.C. § 4303, 4311. (See generally Compl.). For the ADEA claim, Powell seeks: (1) $130,000 in back pay and benefits; (2) $500,000 in compensatory damages; (3) $300,000 in punitive damages; (4) any and all statutory liquidated damages; and (5) all attorney's fees and costs. (Id. § II(15).). For the USERRA claim, Powell seeks: (1) an injunction permitting him to consider the Defendants' second Release for at least 3 days; (2) double all lost benefits or $100,000; (3) attorney's fees and litigation expenses; and (4) that no court costs be charged against him, pursuant to § 4324(h)(1). (Id. § IV(16).).

Powell did not attempt to compel arbitration of these claims prior to bringing suit. Powell's attorney was apprised of the arbitration policy after INA received a copy of the Complaint, but no effort has been made to date to submit Powell's claims to arbitration. (Defs.' Mem. at "Factual Background" § III(D).).

## II. Standard of Review

A plaintiff bears the burden of proving that the federal district court has subject matter jurisdiction over his or her claim; this burden does not shift when defendants challenge the assertion of jurisdiction by a federal district court. Materson v. Stokes, 166 F.R.D. 368, 370 (E.D.Va.1996). The non-movant has the burden of alleging and proving subject matter jurisdiction upon the filing of a motion to dismiss for lack of such jurisdiction. Marks v. U.S. Social Sec. Admin., 906 F. Supp. 1017, 1020 (E.D.Va. 1995). The function of motions to dismiss is to test the law governing claims, not the facts which support them. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Spell v.

6

McDaniel, 591 F. Supp. 1090 (E.D.N.C. 1984). The Court should not dismiss any count unless it appears beyond a doubt that the plaintiff could not recover under any set of facts which could be proven. See Doby v. Safeway Stores, Inc., 523 F. Supp. 1162 (E.D. Va. 1981); Austin v. Reynolds Metals Co., 327 F. Supp. 1145 (E.D. Va. 1970).

### III. Analysis

Two issues are before the Court: (1) whether the First Agreement is valid, therefore requiring the Court to dismiss the instant case; and (2) if not, whether Powell's claims must be stayed pending arbitration. For the reasons discussed below, the Court holds that dismissal is not appropriate, but that the claims should indeed be stayed pending arbitration.

#### A. Whether the First Agreement is Valid

The Court must determine first whether Powell released the Defendants from liability by signing the First Agreement. Neither side appears to dispute that the First Agreement, if valid, clearly effects a release of liability for all claims arising from Powell's employment and his termination. Powell argues that the First Agreement was invalid, however, and thus that there was no release. (Resp. § I.). Powell contends first that "the facts set out in the Complaint succinctly reveal that the circumstances under which Powell signed the [Agreement] clearly violated the USERRA. All of the facts and circumstances surrounding this event will be further flushed out via discovery and presented at trial." (Id.). Powell alleges in the Complaint that Hove pressured him into signing the First Agreement by: (1) setting a January 8, 2000 cut-off for accepting either the First or Second Agreement, knowing that Powell would be on active duty from January 8 through

7

January 11; and then (2) waiting to send him the Second Agreement until Powell had left for active duty, forcing him to accept the First Agreement before leaving, so that he might receive something rather than nothing. (See Compl. §§ IV(11)-(16).). Powell contends that these actions (if true) violate the USERRA, 38 U.S.C. §§ 4303(13), (16) & 4311. 38 U.S.C. § 4311(a) prohibits the denial of "any benefit of employment" to a member of the armed forces of the basis of his or her membership. 38 U.S.C. § 4311(a).[1] Powell contends that Hove's actions deprived him of certain severance benefits provided by the Second Release only, and thus denied him a benefit of employment in violation of the USERRA. (Compl. §§ IV(1)-(2).). Powell argues next that the Defendants never signed the copy of the Second Agreement sent to his residence, "in clear recognition that the [First Agreement] was not valid." (Resp. § I.). Powell argues finally that the Defendants were not released from liability because he revoked the First Agreement within the requisite seven-day period, although neither the Complaint nor Powell's Response appear to elaborate upon how or when he may have done so; counsel contends at oral argument that Powell's revocation was to be construed from the text of letters sent by him to Hove on January 13 and 21, 1999. (See Resp. § I.).

Defendants dispute each of Powell's arguments. They argue first that Powell was not denied a benefit of employment within the meaning of USERRA, even assuming *arguendo* that Hove sent him the Second Agreement when he knew Powell would be away on active duty, because Powell

---

[1]"Benefits of employment" are defined as "any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment." 38 U.S.C. § 4303(2).

8

allegedly concedes that he would not have signed the Second Agreement anyway. (Reply § I(A)(1).). Defendants argue also that Powell was no longer an employee when the Second Agreement was sent to him, and thus any benefits contained in the Second Agreement should not be construed as "benefits of employment" under the USERRA. (Id. § I(A)(1).). Although severance pay and/or benefits do qualify as benefits of employment under 38 U.S.C. § 4303(2), Defendants contend that "[a]ny benefit Powell might have received had he signed the [First Agreement] would not have flowed from his employment, but from a separate and distinct post-employment agreement." (Resp. § I(A)(1) (alteration new).).

Defendants insist further that the Second Agreement was not created and/or sent out of concern for the supposed invalidity of the First Agreement, but rather: (1) to secure releases of additional claims that Powell might choose to bring in a later lawsuit; and (2) to accommodate various requests made by Powell. (Reply § I(A)(2).). As Defendants note, there is nothing in the language of the Second Agreement which suggests that it is being offered due to the supposed invalidity of the First Agreement. (Reply § I(A)(2).). Defendants take issue also with Powell's contention that he revoked the First Agreement within the allotted seven-day period. (Reply § I(B).). Powell does not allege in the Complaint that he revoked the First Agreement on time, nor does he submit either an affidavit or letter of revocation to support such an allegation. (Id.). Defendants look to the Eastern District's ruling in *Volpone v. Caldera* to support their contention that federal courts will not permit a party to amend a Complaint retroactively when posing arguments as to a Motion to Dismiss. (Id., citing Volpone v. Caldera, 190 F.R.D. 177, 180 (E.D. Va. 1999). Defendants note that the First Agreement requires any revocation to be in writing, signed by Powell, and delivered to Gilbride in White Plains, New York. (Reply § I(B).). Defendants observe that no

9

such writing was ever received by Gilbride, nor does Powell allege that he submitted such a writing; they observe also that Powell accepted a large payment after the cut-off date had passed, calling his alleged revocation into question. (Id.). Powell does not elaborate upon his assertion that he revoked in time; absent some showing at oral argument that he indeed submitted the required writing to Gilbride in time, the Court may conclude that he did not revoke.

The question before the Court at this stage is whether the First Agreement is valid even if Powell didn't revoke it – i.e., whether the USERRA concerns raised by Powell render the First Agreement invalid despite his signature. Although a Motion to Dismiss tests the law supporting claims and not the facts supporting them, the Court finds nevertheless that the factual allegations pertinent to this issue must be developed further (whether through discovery, depositions, or pleadings on subsequent motions) before any conclusive answer may be developed. Defendants' Motion to Dismiss is therefore inappropriate at this stage of the proceedings. The Motion to Dismiss is therefore DENIED.

### B. Whether Powell's Claims Must Be Stayed Pending Arbitration

The Court must now determine whether Powell's ADEA and USERRA claims must be stayed pending arbitration. Three questions lie at the heart of this inquiry: (1) whether Powell's work involved interstate commerce, thereby making his claims eligible for arbitration pursuant to the Federal Arbitration Act (herein the "FAA"); (2) if so, whether the Defendants' arbitration policy was valid and enforceable; and (3) if so, whether the Defendants have waived their right to compel arbitration. The Court finds that Powell's work involved interstate commerce, that the arbitration policy is valid and enforceable, and that the Defendants have not waived their right to compel

10

arbitration. The Motion to Stay Judicial Proceedings and Compel Arbitration is therefore GRANTED.

According to the FAA, "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy" arising from the contract or transaction shall be enforceable and irrevocable. 9 U.S.C. § 2. The FAA defines "commerce" to mean interstate commerce. 9 U.S.C. § 1. Both sides agree that the arbitration policy was in writing, but they disagree over whether Powell's work for INA and CIGNA involved interstate commerce. The Court finds that Powell's work "involved" interstate commerce for FAA purposes. Defendants point correctly to the Supreme Court's holding in *Allied-Bruce Terminix Companies, Incorporated v. Dobson*, in which it held that Section 2 of the FAA should be construed broadly to mean that a transaction "involving commerce" needn't be "in" the stream of interstate commerce, but rather that said transaction must merely *affect* interstate commerce. (Defs.' Mem. § II(A), citing Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 273, 276 (1995).). Powell contends that his work did not affect interstate commerce, because he allegedly practiced law solely within Virginia. (Resp. § II(A).). According to Powell, his job duties "did not involve the practice of law across interstate lines." (Id.). Powell does not elaborate upon this argument, however, nor does he submit anything to the Court to counter the clear impression arising from these facts that his work did indeed affect interstate commerce. Powell is a Virginia resident who worked for out-of-state employers. As managing attorney for the Richmond FLO, he represented the interests of those employers as well as those of their customers, many of whom were also located outside of Virginia. Defendants report also that as part of his employment, Powell attended conferences and client meetings outside of Virginia, and that he communicated frequently with persons and companies outside of Virginia.

11

(Reply § III(A).).  Powell's activities therefore meet the FAA's low threshold for "involving interstate commerce" as defined in *Allied-Bruce Termintx*.

The Court finds next that the arbitration policy at issue here is both valid and enforceable. As a general rule, arbitration agreements are favored in the federal courts; such agreements are interpreted under general principles of contract law; these cases are uncontroverted and are not discussed further here. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995) (in determining whether a party agreed to arbitrate a given dispute, apply ordinary state-law principles governing contract formation); AT&T Techs. v. Communication Workers of America, 475 U.S. 643, 648-49 (1986) (whether a party agreed to arbitrate a particular dispute is a matter of contract law for a court to decide); Arrants v. Buck, 130 F.3d 636, 640 (4th Cir. 1997) ("Courts decide whether there is an agreement to arbitrate according to common law principles of contract law."). See also Gilmer v. Interstate/Johnson Corp., 500 U.S. 20, 26 (1991) ("[I]t should be kept in mind that 'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.'"). Powell argues, however, that the arbitration policy propounded by the Defendants is invalid for three reasons. He argues first that the arbitration policy forces employees to submit all federal law claims to binding arbitration without providing any "mechanisms by which such employees can make a clear and unmistakable waiver" of their rights to redress in the courts. (Resp. § II(B).). Powell looks to the Supreme Court's decision in *Wright v. Universal Maritime Service Corporation*, in which it was called upon to decide whether an arbitration provision within a collective bargaining agreement barred judicial consideration of employment discrimination claims. (Id., citing Wright v. Universal Maritime Service Corp., 525 U.S. 70 (1998).). The Supreme Court found that the right to a federal judicial forum for employment discrimination claims is protected from ambiguous waivers in a

12

collective bargaining agreement such as the one at bar, which compelled arbitration of all "matters under dispute" without any reference to statutory antidiscrimination requirements. Wright, 525 U.S. at 80.

This position misconstrues the true ambit of *Wright*. At most, *Wright* invalidates mandatory arbitration clauses which are general and make no specific reference to claims brought pursuant to federal antidiscrimination laws. The Supreme Court did not hold that collective bargaining agreements could not *ever* subject employment discrimination claims to binding arbitration, but merely that efforts to do so must contain direct and explicit waivers of a claimant's right to a judicial forum. See Wright, 525 U.S. at 79, 82. The Supreme Court acknowledged that a statutory right to a judicial forum is not a substantive right. Id. at 80. *Wright* is therefore inapplicable to the facts at bar: (1) no collective bargaining agreement is involved here, and thus there is "no concern here with a third party, such as a union, waiving an individual's statutory rights;" and (2) the Defendants' arbitration policy makes explicit reference to federal antidiscrimination measures, including but not limited to the ADEA, unlike the arbitration policy at issue in *Wright*. (See Reply § III(B)(1).). The Court must therefore look to *Gilmer*, which speaks of the broad federal preference for arbitration.

Powell argues next that the arbitration policy is invalid because the Defendants have allegedly adopted three conflicting arbitration policies, as evidenced by the original arbitration policy document with attached cover letter, the L&PA Handbook and the CIGNA Handbook. (Resp. § II(B).). Powell claims that the version contained in the original arbitration policy document "notes that the arbitration policy is not final and binding but simply must be used before a party proceeds to court," in apparent contrast to the versions contained in the L&PA Handbook and the CIGNA Handbook. (Id.). Powell contends that these two versions provide for final, binding arbitration with

13

no promise of later redress in the courts. (Id.). Powell is wrong, however. The arbitration policy document states clearly that "arbitration by a neutral third-party is the *required and final means* for the resolution of any serious disagreements and problems not resolved by the Division's internal dispute resolution processes." (Defs.' Mem. § III(A) [emphasis new].). There is therefore no conflict with the policy descriptions found in the handbooks, so the arbitration policy cannot be considered invalid on this basis.

Powell's third argument as to the arbitration policy's alleged invalidity is that it does not comport with the Older Workers Benefit Protection Act (herein the "OWBPA"), 29 U.S.C. §§ 621 *et seq.* (Resp. § II(C).). He alleges numerous procedural violations of the OWBPA in his Response and at oral argument; these violations need not be listed here. Powell concludes that "since none of the policies comply with the [OWBPA], [the] ADEA claim never lawfully was made subject to final and binding arbitration." (Id.). Even if the arbitration policy is deficient in the manner described by Powell, however, at least three federal circuits have held that the OWBPA protects only against the waiver of a right or claim, not against the waiver of a judicial forum. Seus v. John Nuveen & Co., 146 F.3d 175, 181 (3rd Cir. 1998), cert. denied, 119 S.Ct. 1208 (1999); Rosenburg v. Merrill Lynch, Price, Fenner & Smith, Inc., 170 F.3d 1, 12-14 (1st Cir. 1999); Williams v. CIGNA Financial Advisors, Inc., 56 F.3d 656 (5th Cir. 1995). The Fifth Circuit notes in *Williams* that "[t]here is no indication that Congress intended the OWBPA to affect agreements to arbitrate employment disputes." Williams, 56 F.3d at 660. Though the Fourth Circuit has not spoken yet on this specific issue, the position taken by the three circuits cited above makes intuitive sense. So long as an arbitration policy does not compromise the substantive right at stake — here, the right of an employee to complain of age discrimination in violation of the ADEA — that policy should not be overridden

14

simply because it diverts the consideration of a given claim from the federal courts to a neutral arbitrator. As *Gilmer* recognizes, such a diversion is favored in the law where no substantive rights are compromised. The arbitration policy here therefore appears to survive Powell's third argument, and is therefore valid and enforceable.

The Court must decide finally whether the Defendants have waived their right to compel arbitration. Powell contends that the Defendants did waive their right to compel arbitration under "well-established contract law" by acting in a manner inconsistent with that supposed right with full knowledge of all material facts. (Resp. § II(D), citing Bergmueller v. Minnick, 238 Va. 332 (1989); Fox v. Deese, 234 Va. 412 (1987).). As evidence of behavior allegedly inconsistent with a right to compel arbitration, Powell points to his discussions with the Defendants after his termination, in which he reports that the Defendants sought to resolve his claims through his signing of the First Agreement. (Id.). Powell reports that the Defendant never mentioned arbitration at any point during these negotiations (even after sending him copies of the First and Second Agreements), despite their awareness of his evidence in support of the claims. (Id.). Powell contends that the Defendants' failure to broach the subject of arbitration during the negotiations constitutes a waiver of their right to compel arbitration. (Id.). He looks to the Fourth Circuit's decision in *In re Mercury Construction Corporation* for support, in which the Fourth Circuit held that when a party delays seeking arbitration to the point that actual prejudice is inflicted upon the opposing party, the delaying party may be held to have defaulted and thus have waived the right to compel arbitration. (Id., citing In re Mercury Construction Corp, 656 F.2d 933, 939 (4th Cir. 1981).). Powell points also to the Fourth Circuit's opinion in *Maxum Founds, Inc. v. Salus Corporation*, in which it held that "[a] litigant may waive its right to invoke the [FAA] by so substantially utilizing the litigation machinery that to

15

subsequently permit arbitration would prejudice the party opposing the stay." (Resp. § II(D), citing Maxum Founds, Inc. v. Salus Corp., 779 F.2d 974, 981 (4th Cir. 1985).). Powell contends in sum that the Defendants have acted in a manner inconsistent with a right to compel arbitration by engaging in settlement discussions with no mention of the arbitration policy, only to refer to arbitration at this late date. (Resp. § II(D).).

As a preliminary matter, whether the Defendants ever mentioned arbitration during the settlement negotiations boils down to a swearing contest. The Court need not pick the winner in this contest, however, for it is clear that Powell has failed even to allege (much less demonstrate) that the Defendants' supposed earlier failure to press for arbitration ever actually prejudiced him, a showing the Fourth Circuit requires in order to find that the party seeking arbitration has defaulted. (Id.; see also American Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88, 95 (4th Cir. 1996).). A mere delay in seeking arbitration is not enough; actual prejudice must be shown. Mercury Construction, 656 F.2d at 939. In the absence of such a showing, the Court cannot find that the Defendants have defaulted and thus waived their right to compel arbitration, for the Fourth Circuit has ruled that "[w]aiver and estoppel are disfavored under the FAA." citing O'Neil v. Hilton Head Hospital, 115 F.3d 272, 276 (4th Cir. 1997).). Indeed, even *Maxum* acknowledges that "[a]lthough this principle of 'default' is akin to waiver, the circumstances giving rise to a statutory default are limited, and . . . are not to be lightly inferred." Maxum, 779 F.2d at 981. Parties claiming waiver of the right to compel arbitration by an opposing party must demonstrate that actual prejudice arose from the delay. American Recovery Corp., 96 F.3d at 95; Mercury Construction, 656 F.2d at 939. Finally, Defendants note correctly that litigation has not proceeded far – the Defendants sought merely to secure a release, not knowing whether Powell would ever attempt to

16

hale them into court. (Reply § III(D).). For these reasons, it is clear that Powell has demonstrated neither that the Defendants failed to discuss the arbitration policy during settlement negotiations, nor that such a failure actually prejudiced him in some way. Defendants have therefore not waived their right to compel arbitration under the laws of this Circuit.

## IV. Conclusion

While outright dismissal of the case is inappropriate at this stage, the Court finds no reason why arbitration could not address Powell's claims fairly, efficiently and with no injury to either side's substantive rights under federal law. The Motion is therefore DENIED in part and GRANTED in part:

1. The Motion to Dismiss is DENIED; and

2. The Motion to Stay Judicial Proceedings and Compel Arbitration is GRANTED.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

And it is SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE

_JUN - 6 2000_
DATE

17

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION




EARNEST WAYNE POWELL

    Plaintiff.

v.

CIGNA PROPERTY AND CASUALTY
CO., et al.

    Defendants.

Civil Action Number 3:99CV857

## ORDER

THIS MATTER is before the Court on the Defendants' Motion to Dismiss or, in the Alternative, to Stay Judicial Proceedings and Compel Arbitration. For the reasons stated in the accompanying Memorandum Opinion, the Motion is DENIED in part and GRANTED in part:

1. The Motion to Dismiss is DENIED; and
2. The Motion to Stay Judicial Proceedings and Compel Arbitration is GRANTED.

Let the Clerk send a copy of this Order to all counsel of record.

And it is SO ORDERED.

                                           /s/ James R. Spencer
                                      UNITED STATES DISTRICT JUDGE

JUN - 6 2000

DATE