# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

99 SEP 30  AM

U.S. DISTRICT
EAST. . . . .

SHEILA THOMAS,

        Plaintiff,

    v.

CIGNA HEALTHCARE OF OHIO,
INC., et al.

        Defendants.

CASE NO. C2-98-875 and
C2-98-997
JUDGE EDMUND A. SARGUS, JR.
MAGISTRATE JUDGE MARK R. ABEL

## OPINION AND ORDER

Plaintiff Sheila Thomas commenced this action on August 28, 1998 claiming damages, as a result of racial discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981 (a) and 28 U.S.C. § 1343. (Complaint ¶1). This matter is before the Court on Defendants' October 7, 1998 motion to compel arbitration pursuant to its Arbitration Policy and to stay judicial proceedings (doc. 10) and plaintiff's February 9, 1999 motion for leave to file a first amended complaint and to remand (doc. 15).

Plaintiff Thomas alleges that Defendant Cigna Health Care of Ohio, Inc. discriminated against her in her employment as a clinical staff pharmacist because she is an African-American. Plaintiff Thomas has been employed by Cigna Health Care of Ohio

1

since June 16, 1994. Plaintiff Thomas alleges that she was disciplined after she protested about the rescission of her previously reserved vacation time for the period May 5 through May 10, 1997. Further, she was denied promotion to Pharmacy Manager in February 1997. In addition, Plaintiff Thomas alleges defamation. Plaintiff Thomas asserts that Cigna Health Care of Ohio threatened to suspend her and retaliated against her following meetings that were held on April 28 and May 1, 1997.

Plaintiff Thomas and the Defendants have a written agreement to submit all employment-related disputes, including the one described in Plaintiff Thomas' Complaint, to arbitration (the "Arbitration Policy"). However, the following issues are in dispute: (1) whether the § 1 exception of the Federal Arbitration Act applies in this case, (2) whether Title VII claims and claims under the Civil Rights Act of 1991 are subject to arbitration, (3) whether the Arbitration Policy is violative of the public policy of Title VII, (4) whether there was sufficient consideration to support the parties' agreement to arbitrate any employment-related disputes, (5) whether Plaintiff Thomas knowingly and voluntarily agreed to submit any employment-related disputes to arbitration, and (6) whether the Arbitration Policy clearly encompasses causes of action under Title VII regardless of the underlying factual basis for the claim. (Doc. 11 and Doc. 14).

2

## Motion to Amend

Plaintiff initially filed suit in both federal and state court. The state court suit is essentially based upon claims arising under Ohio Revised Code §4112.01, a section similar, but not identical, to Title VII. Defendants removed the state court suit to this Court. Plaintiff filed a motion to remand. By a December 16, 1998 Order, the Court denied Plaintiff's motion to remand because the complaint filed in State court pleaded a claim under Title VII. The Court's Order also consolidated both cases.

Subsequently, on February 9, 1999, Plaintiff Thomas filed a motion for leave of Court to file her first amended complaint and a motion to remand the amended complaint to state court. (Doc. 15). For the reasons that follow, Plaintiff's motion for leave to file a first amended complaint and to remand is denied.

The motion to amend comes too late. Plaintiff's motion to remand has been denied. The cases have been consolidated. The motion to compel arbitration has been fully briefed at the point the motion to amend was filed. The time for an amendment to the pleadings to permit remand to the state court has long since passed.

### I.

On September 8, 1993, Plaintiff Thomas began employment with Principle Health Care of Ohio, Inc. (Doc. 10, Def. Motion to

3

Compel, Ex. A ¶2). On June 16, 1994, as a result of CIGNA Health Care's acquisition of Principle Health Care of Ohio, Inc., Plaintiff Thomas was offered employment with CIGNA Health Care of Ohio, Inc. in the position of staff pharmacist. *Id.* On June 20, 1994, Plaintiff Thomas signed an employment application which stated that her employment was at-will. *Id.* at Ex. 1. At that time, Defendants assert that Plaintiff Thomas was given a copy of the *You and CIGNA Employee Handbook* ("Handbook"); however, there is no evidence in the record that Plaintiff Thomas actually received it. *Id.* at Ex. A ¶3.

On July 25, 1995, a memo addressed to "All Fellow Employees" from Donald M. Levinson, Human Resources & Services, notified all employees of the Mediation/Arbitration Policy. *Id.* at Ex. A-3. Another memo also dated July 25, 1995, which was addressed to "CIGNA HealthCare Associates" from S. Ty Alexander, Senior Vice President of Human Resources, notified all CIGNA Healthcare Associates that the Mediation/Arbitration Policy became effective immediately. *Id.* at Ex. A-4. However, there is no proof in the record that Plaintiff Thomas specifically received either memo. On September 26, 1996, Carol Olsen, Senior Vice President of Human Resources, sent an interoffice memorandum addressed to "All CIGNA HealthCare Employees" along with the CIGNA Healthcare Division Employment Dispute Arbitration Policy ("Arbitration Policy") to all

4

CIGNA employees. *Id.* at Ex. A-5. The policy states that by working at the company, the employee agrees to arbitrate "serious employment-related disagreements" including, inter alia, claims under "Title VII. . .and other state . . .statutes . . .regarding employment discrimination." However, again, there is no proof in the record that Plaintiff Thomas received the interoffice memo.

On January 20, 1997 at the Hamilton Road pharmacy, Plaintiff Thomas was accused of displaying unprofessional conduct during a discussion with pharmacy technician Carolyn Final, who is white. (Doc. 11, Thomas Aff. ¶5). Subsequently, on January 24, 1997, Plaintiff Thomas was issued a "Formal Notice" of unprofessional behavior by her supervisor, Defendant Marsolo, in regard to the January 20, 1997 incident. *Id.* at ¶6. Plaintiff Thomas asserts that she was not consulted during the investigation of the incident by her supervisor, Defendant Marsolo, or by anyone else from Human Resources, although Ms. Final was questioned about the incident. *Id.* at ¶5.

On January 27, 1997, Plaintiff Thomas signed and dated a validation form stating that she received a copy of the Arbitration Policy. (*Id.* at ¶9 and Def. Motion to Compel, Ex. A-6). However, Plaintiff Thomas asserts that neither her supervisor, Defendant Marsolo, or any individual from Human Resources discussed the Arbitration Policy with her. (Doc. 11, Thomas Aff. ¶7). Plaintiff

5

Thomas asserts that she signed the validation form without the ability to review all of the documents referenced within the Policy, and without the opportunity to have it reviewed by an attorney. *Id.* at ¶9. Additionally, on January 27, 1997, Plaintiff Thomas filed a formal complaint with the Speak Easy Coordinator, Tom Pederson, based upon race and sex discrimination. *Id.* at ¶11.

On February 6, 1997, Plaintiff Thomas met with Defendants Nichol and Kilcher to discuss the Notice of Unprofessional Behavior she had received on January 24, 1997. (Complaint ¶14). During the discussion, Defendant Nichol allegedly told Plaintiff Thomas that "we have to understand that in your background, that people are or tend to be more aggressive and speak loudly, and that is not unusual." *Id.* The following day, February 7, 1997, Plaintiff Thomas applied for the position of Pharmacy Manager, which was subsequently denied. *Id.* at ¶18. On March 10, 1997, Plaintiff Thomas filed a charge of discrimination with the Ohio Civil Rights Commission and the United States Equal Employment Opportunity Commission. *Id.* at ¶15.

Meetings were held on April 28 and May 1, 1997 between Plaintiff Thomas and Defendants Nichol and Kilcher, in which Plaintiff Thomas was indefinitely suspended, denied access to legal counsel, and escorted off CIGNA's premises by the police. *Id.* at ¶25. On May 20, 1997, Plaintiff Thomas was issued a Written

6

Warning for the January 20, 1997 alleged acts, and told to return to work. (*Id.* at ¶26 and Doc. 11, Thomas Aff. ¶12). On June 19, 1997, Plaintiff Thomas filed a retaliation charge with the Ohio Civil Rights Commission and the United States Equal Employment Opportunity Commission. (Complaint ¶27).

On September 26, 1997, Plaintiff Thomas was called into a meeting with Defendant Esteph where she was told to maintain the decorum of the pharmacy. *Id.* at ¶28. Defendant Esteph thereafter told Plaintiff Thomas to go home, and then contacted the police. *Id.* The police arrived and questioned Plaintiff Thomas in the parking lot as to what had transpired with Defendant Esteph. *Id.* Plaintiff Thomas further asserts that Defendant Kramer subsequently informed all the employees of the pharmacy that Plaintiff Thomas had been escorted off Defendant CIGNA's premises during the incident. *Id.*

On June 1, 1998, a handbook which references the Arbitration Policy was mailed to all pharmacy employees. (Kramer Dec. ¶4). There is, however, no evidence in the record that Plaintiff Thomas specifically received the handbook at that time. On September 29, 1998, Plaintiff Thomas signed a receipt/acknowledgment form for the handbook. (Doc. 11, Thomas Aff. ¶2&3). Plaintiff Thomas asserts that she did not receive the handbook until approximately one week prior to September 29, 1998, the first and only time she had

7

received a copy of the handbook. *Id.* Furthermore, Defendant Kramer, another supervisor, requested the receipt/acknowledgment form from Plaintiff Thomas on two occasions during that one week period that Plaintiff Thomas first received the handbook. *Id.*

Plaintiff Thomas states that upon starting employment with CIGNA, she was not informed that there was a compulsory arbitration policy for employment related claims. (Doc. 11, Thomas Aff. ¶2). There is no evidence in the record that Plaintiff Thomas was in fact given a copy of the handbook, which references the arbitration policy, at the time she began her employment with CIGNA. Plaintiff Thomas maintains that she did not receive the two memos dated July 25, 1995 regarding the arbitration policy, nor did she receive the September 26, 1996 memo regarding the updated arbitration policy. *Id.* at ¶4. There is no direct evidence of the distribution of these notices beyond that they were interoffice memorandum addressed to "All Fellow Employees" and "CIGNA HealthCare Associates" for the July 25, 1995 memos, and addressed to "All Cigna HealthCare Employees" for the September 26, 1996 memo. *Id.* CIGNA offers no evidence of the distribution list for the memos or of any instructions that may have been given to supervisors about distributing the memos to employees like Plaintiff Thomas. There is also no evidence that Plaintiff Thomas did in fact receive any of the memos.

8

Plaintiff Thomas states that on January 27, 1997, one copy of a summary of the CIGNA Arbitration Policy was sent through intra-office mail to be circulated throughout the Hamilton Road pharmacy where she worked. *Id.* at ¶7. Attached to the Policy summary is a validation form and a note authored by her supervisor, Defendant Marsolo, ordering all employees to read and sign. *Id.* Plaintiff Thomas asserts that there was no discussion of the Policy by her supervisor, Defendant Marsolo, or by anyone from Human Resources. *Id.* There is no evidence in the record that Plaintiff Thomas had knowledge of the arbitration policy prior to January 27, 1997.

A.    **Facts Regarding Interstate Commerce**

Defendant CIGNA is a health maintenance organization, with its principle place of business in Philadelphia, Pennsylvania. (Complaint ¶3). Defendant CIGNA is licensed to do business in the State of Ohio, and conducts business in Franklin County. *Id.* Defendant CIGNA operates two pharmacies in Columbus: one at 161 N. Hamilton Road and the other at 4885 Olentangy River Road. *Id.*

Plaintiff Thomas' job functions as a staff pharmacist at the Hamilton Road location include being responsible for (1) dispensing prescriptions, (2) providing clinical counseling to patients and health professionals alike, (3) monitoring patient profiles for therapy, allergies and drug interaction, and (4) overseeing the overall day to day operation of the pharmacy. (Kramer Dec. ¶2).

9

Plaintiff Thomas regularly produces and transmits work across state lines via electronic mail and phone lines. *Id.* at ¶3. She frequently uses the telephone to report and communicate to CIGNA Pharmacy Services located in Mount Arlington, New Jersey for medical and pharmacy authorizations and benefits inquiries. *Id.* Plaintiff Thomas also regularly communicates to CIGNA Pharmacy Services Representatives in Mount Arlington, New Jersey for prescription authorizations and general pharmacy questions. *Id.*

B.   The Arbitration Policy

CIGNA's Arbitration Policy is somewhat comparable, in terms of procedural safeguards, to the NYSE arbitration rules in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31-34 (1991). CIGNA's Arbitration Policy provides that the American Arbitration Association ("AAA") will send to the employee and CIGNA an identical list of all arbitrators who are members of the regional Employment Dispute Resolution Roster of the AAA. (Def. Motion to Compel, Ex. A-7 at 4 ¶6(a)). The AAA will provide, to the extent possible, the names of the parties or their representatives in recent cases decided by the listed arbitrators. *Id.*

CIGNA's Arbitration Policy states that both the employee and CIGNA will have no more than ten (10) calendar days from the date the AAA mails them the list to cross off any name(s) to which the party objects; number the remaining names in order of preference;

10

and return the list to the AAA. (Def. Motion to Compel, Ex. A-7 at 5 ¶6(b)). The AAA will then appoint one arbitrator from the names remaining on the lists, and if possible, will try to honor the preferences of both the employee and CIGNA. *Id.* at ¶6(d). However, if the employee and CIGNA do not agree on any of the listed names, the AAA will appoint an arbitrator from among other members of its Roster of employment dispute arbitrators. *Id.* Conversely, in *Gilmer*, each party was allowed one peremptory challenge and unlimited challenges for cause. *See Gilmer*, 500 U.S. at 31.

As in *Gilmer*, CIGNA's Arbitration Policy provides that the prospective arbitrator shall disclose any circumstances likely to prevent a prompt arbitration or to create a presumption of bias. *Id.*; (Def. Motion to Compel, Ex. A-7 at 5 ¶7). Furthermore, CIGNA's Arbitration Policy provides that each party will submit to the other the names, work or home addresses and job titles of all witnesses the party expects to have testify at the hearing, and a copy of all exhibits and/or documents that the party expects to produce at the hearing. (Def. Motion to Compel, Ex. A-7 at 6 ¶10(a)). In addition, both the employee and CIGNA will be entitled to take no more than two (2) days of depositions. *Id.* at 6-7 ¶10(b). The NYSE discovery provisions in *Gilmer*, on the other hand, allowed for document production, information requests,

11

depositions, and subpoenas. *See Gilmer*, 500 U.S. at 32.

CIGNA'a Arbitration Policy states that the arbitrator will maintain the privacy of the hearings and any decision unless he/she decides that it would be appropriate in the circumstances to make the decision public or is required by law to do so. (Def. Motion to Compel, Ex. A-7 at 7-8 ¶11). The arbitrator's decision is also required to be in writing and signed by the arbitrator. *Id.* at 11 ¶23(a). The arbitrator will issue a written opinion giving the reasons for the decision, and the decision will be implemented in the manner required by law. *Id.*

The NYSE rules in *Gilmer* require that all arbitration awards be in writing and that the awards contain the names of the parties, a summary of the issues in controversy, and a description of the award issued. *See Gilmer*, 500 U.S. at 33. In addition, the award decisions are made available to the public. *Id.*

Finally, the NYSE rules in *Gilmer*, which did not restrict the types of relief an arbitrator may award, are similar to the scope of relief provided in CIGNA's Arbitration Policy. *Id.* at 34. CIGNA's Arbitration Policy states that the arbitrator will have full power and authority to award any remedy that either party would have been entitled to had the employee taken the dispute to a government agency or to a court. (Def. Motion to Compel, Ex. A-7 at 11 ¶23(b)).

12

## C.   Waiver of the Right to a Jury Trial

CIGNA's Arbitration Policy states that the "[p]arties to these Rules and Procedures shall be deemed to have consented to the entry of a judgement upon the arbitration decision in any federal or state court with jurisdiction over the parties and the dispute." *Id.* at 12 ¶26(b).   Furthermore, the employee handbook, which references the arbitration policy, states that:

> If the law in the state in which an employee works provides for a government agency hearing to decide questions of law related employment discrimination claims, then the agreement of the employee and the employer is that arbitration must be used instead of a government agency hearing to decide the claim or going to court and having a jury.

(Def. Motion to Compel, Ex. B-1 at 30).

The handbook also explains that "[t]he arbitrator will have all of the power a judge hearing the dispute would have so that the significant differences between going to arbitration and going to court are that the process will be much faster, less expensive and there will be no jury." *Id.* at 31.   Furthermore, in the updated copy of the Arbitration Policy which was distributed by memo on September 26, 1996, it was stated in the "STATEMENT OF POLICY" section that "[t]his policy is intended to prevent an employee from going to court over employment related disputes, it is not intended to take away any other rights." (Def. Motion to Compel, Ex. A-5).

13

## D. Contract Formation

CIGNA's employee handbook discusses mutual promise, and less explicitly, consideration. The handbook states:

> *Mutual promises by both the employee and the employer to arbitrate employment related legal claims is a term and condition of an employee's employment and arbitration must be used rather than going to court to enforce legal rights and claims (or going to a government agency which in some states acts like a court in judging claims).*

*Id.* at 30. Thus, consideration is not expressly discussed in the handbook, although, according to Cigna, the continued employment of the employee in exchange for agreeing to arbitrate any employment related legal claim constitutes consideration. Here, Plaintiff Thomas was not compensated beyond obtaining continued employment for signing the arbitration policy agreement.

## II.

### I.   Title VII claim not exempt from arbitration under 9 U.S.C. § 1

Plaintiff Thomas cites the exception in the Federal Arbitration Act, 9 U.S.C. § 1 ("FAA"), which states that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," to support her claim that the employment dispute herein is not subject to the FAA. Plaintiff Thomas argues that she "regularly produces and transmits work

14

across state lines via electronic mail and phone lines . . . [and that] she produces work in furtherance of products and services that are distributed across state lines." (Doc. 10, Kramer Dec. ¶3). Based upon this statement, Plaintiff Thomas argues that she is engaged in the movement of goods in interstate commerce in the same manner as seamen or railroad workers and therefore, pursuant to the § 1 exception, she is not subject to the provisions of the FAA. (Doc. 11, Pl. Memo Contra at 2).

The Defendants argue that the Sixth Circuit decision in *Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592, 601 (6th Cir. 1995), which held that the § 1 exception to the FAA should be interpreted narrowly to include only workers "actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are," controls here. (Doc. 14, Def. Reply Memo at 1-2). The Defendants cite as support the explicit holdings of the First, Second, Third, Fifth, Seventh, and D.C. Circuits, which are in accord with the Sixth Circuit's holding in *Asplundh*. *Id.* at 2.

Defendants argue that Plaintiff Thomas is not engaged in the movement of goods in interstate commerce in the same way seamen and railroad workers are; rather Plaintiff Thomas works in a pharmacy as a pharmacist, which does not involve the transportation of drugs across state lines. *Id.* at 3. Furthermore, Defendants argue that while her work does involve interstate commerce sufficient to

15

trigger application of the FAA, the performance of her work does not generally involve the movement of goods in interstate commerce. *Id.*

The court in *Asplundh* noted that "[w]ith one exception, every circuit court which has addressed this question since *Tenney* has held that the exclusionary clause of § 1 of the Act should be narrowly construed." *Asplundh*, 71 F.3d at 599. The Fourth Circuit's decision in *United Electrical, Radio & Machine Workers v. Miller Metal Products, Inc.*, 215 F.2d 221, 224 (4th Cir. 1954) was the exception. However, the court in that case expressly limited its holding to the issue of the applicability of the Arbitration Act to collective bargaining agreements, and its questionable today whether the case is still good law. *Id.* at 599-600. Since *Asplundh* was decided, the Ninth Circuit has held that § 1 of the Arbitration Act exempts all employment contracts from its provisions. *See Craft v. Campbell Soup Co.*, 161 F. 3d 1199, 1203 (9th Cir. 1998).

This Court is bound by the Sixth Circuit's conclusion in *Asplundh* that "the exclusionary clause of § 1 of the Arbitration Act should be narrowly construed to apply to employment contracts of seamen, railroad workers, and any other class of workers actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are." *Asplundh*, 71

16

F.3d at 600-01. The court articulated that "the meaning of the phrase 'workers engaged in foreign or interstate commerce' is illustrated by the context in which it is used, particularly the two specific examples given, seamen and railroad employees, those being two classes of employees *engaged in the movement of goods in commerce*." *Id*. at 601. (emphasis added).

Although Plaintiff Thomas frequently uses the telephone to report and communicate to CIGNA Pharmacy Services located in Mount Arlington, New Jersey for medical and pharmacy authorizations, benefits inquiries, and general pharmacy questions, she does not move *goods* in interstate commerce within the meaning of the § 1 exception as interpreted by the Sixth Circuit. There is no evidence in the record that Plaintiff Thomas directly distributes pharmaceuticals across state lines. Even though Plaintiff Thomas produces work in *furtherance* of products and services that are distributable across state lines, she is not engaged in the movement of goods in interstate commerce in the same method or manner as are seamen and railroad workers. Plaintiff Thomas does not physically load or unload pharmaceuticals onto ships or railcars for distribution. Therefore, the FAA § 1 exception does not apply to Plaintiff Thomas' Title VII claim.

17

## II. Plaintiff Thomas' claims under Title VII and the 1991 Civil Rights Act (amending Title VII) are subject to arbitration

The Supreme Court has only peripherally addressed the precise issue before this Court, that being whether the plaintiff has waived her right to a judicial forum under the terms of the defendant's mandatory arbitration policy. In *Alexander v. Gardner-Denver*, 415 U.S. 36 (1974), the Court held that a Title VII plaintiff was not precluded from filing a separate action under the statute, despite an arbitration clause in a collective bargaining agreement. In *Gardner-Denver*, the plaintiff had pursued the same claims brought under Title VII in the grievance-arbitration process.

Seventeen years later, the Supreme Court decided *Gilmer v. Interstate/Johnson Cane Corp.*, 94 S. Ct. 1011 (1991). Therein, the Court held that a statutory claim brought under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §621 was subject to compulsory arbitration under an agreement signed by the plaintiff and his employer. The availability of arbitration of the ADEA claim precluded direct judicial relief.

Recently, in *Wright v. Universal Maritime Service Corp.*, 119 S. Ct. 391, 395 (1998), the Supreme Court noted that, "There is obviously some tension between these two lines of cases. Whereas *Gardner-Denver* stated that 'an employee's right, under Title VII are not susceptible of prospective waiver' . . . *Gilmer* held that

18

the right to a federal judicial forum for an ADEA claim could be waived." (citations omitted).

In *Wright*, the Supreme Court addressed the question of whether a general arbitration clause (e.g. governing "any dispute. . . arising out of the terms and/or conditions of this Agreement") in a collective bargaining agreement compels arbitration of a statutory claim, such as an alleged violation of the Americans with Disabilities Act, 42 U.S.C. §12101, and otherwise precludes direct judicial relief. A unanimous Supreme Court held that a general clause defining issues subject to arbitration which does not contain "a clear and unmistakable waiver of the covered employees' right to a judicial forum" does not compel arbitration of a statutory claim.

Unfortunately, the Supreme Court declined to address the issue before this Court, that being whether a company-wide mandatory arbitration policy (similar in this regard to a collective bargaining agreement) may be used to compel arbitration of a statutory claim within the scope of issues referable to arbitration and thereby prevent an employee from seeking direct relief in a judicial forum. Here, unlike the facts in *Wright*, the scope of arbitration expressly includes Title VII claims or similar claims under Ohio law. In *Wright*, the Supreme Court concluded by noting, "We do not reach the question whether such a waiver would

19

be enforceable." *Id.* at 397.

Plaintiff Thomas argues that the legislative history and the underlying purpose of the 1991 Civil Rights Act, 42 U.S.C. §2000 et seq. compels a conclusion that Title VII claims cannot be the subject of mandatory arbitration. *Id.* As support, Plaintiff Thomas cites *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182, 1198 (9th Cir. 1998), in which the court stated: "To the contrary, the legislative history of the [1991 Civil Rights] Act makes it absolutely clear that Congress intended § 118 to codify the *Gardener-Denver [Alexander v. Gardener-Denver Co.*, 415 U.S. 36 (1974)]* approach to compulsory arbitration agreements . . . with respect to Title VII claims." (Doc. 11, Pl. Memo Contra at 3). The Supreme Court in *Gardener-Denver* held that an arbitration clause in a collective bargaining agreement did not preclude an employee from bringing a Title VII claim in court. *See Gardener-Denver*, 415 U.S. at 45, 47.

Furthermore, Plaintiff Thomas argues that the U.S. Equal Employment Opportunity Commission ("EEOC") stated, in a *Notice* dated July 10, 1997, that Congress intended to preclude the compulsory arbitration of Title VII claims. (Doc. 11, Pl. Memo Contra at 4). According to Plaintiff Thomas, the EEOC condemned compulsory arbitration for undermining the labor and civil rights protection it is charged with enforcing, and in its official

20

policies, the EEOC has stated that such agreements are inconsistent with the text, purpose, and legislative history of Title VII. *Id.* citing *EEOC Notice No.* 915.0021).

The Defendants argue that the Sixth Circuit and this Court have already held that claims under the 1991 Civil Rights Act and under Title VII of the 1964 Civil Rights Act can be subject to mandatory arbitration. Doc. 14, Def. Reply Memo at 4). The Defendants cite *Cosgrove v. Shearson Lehman Brothers*, 1997 WL 4783 (6th Cir. 1997) (unrp't) in which the Sixth Circuit specifically rejected Plaintiff's argument that claims under the 1991 Civil Rights Act and Title VII are not arbitrable. The Defendants also cite *Willis v. Dean Witter Reynolds*, 948 F.2d 305, 312 (6th Cir. 1991) in which the Sixth Circuit held that Title VII claims are arbitrable: "the plaintiff's arguments which suggested that something inherent in Title VII precludes the enforcement of valid arbitration agreements in circumstances where the FAA is otherwise applicable was rejected in *Gilmer*." (Doc. 14, Def. Reply Memo at 4).

Additionally, the Defendants argue that several circuit courts have read the statutory text of § 118 of the 1991 Civil Rights Act as an explicit basis for concluding that Congress did not intend to preclude a waiver of judicial resolution of Title VII claims. *Id.* at 4-5 (citing, inter alia, *Seus v. John Nuveen & Co., Inc.*, 146

21

F.3d 175, 182 3rd Cir. 1998) ("On its face, the text of § 118 evinces a clear Congressional intent to encourage arbitration of Title VII and ADEA claims, not to preclude such arbitration.")).

In analyzing the merits of both side's arguments, the Sixth Circuit decision in *Willis* is controlling unless the 1991 Civil Rights Act changes its analysis. The court in *Willis* concluded that the *Gilmer* Court rejected the argument that Title VII precludes an arbitral forum from handling such claims if a party agrees to submit all statutory claims to arbitration. *See Willis*, 948 F.2d at 309. In doing so, the Sixth Circuit quoted language from the *Gilmer* Court which had determined that "if Congress intended the substantive protection afforded [by the ADEA] to include protection against waiver of the right to a judicial forum, that intention [would] be deducible from text or legislative history." *Id.* (citing *Gilmer*, 500 U.S. 20, 35 (1991)).

The statutory text of § 118 of the 1991 Civil Rights Act provides that "[w]here appropriate and to the extent authorized by law, the use of alternative dispute resolution, including . . . arbitration, is encouraged to resolve disputes arising under [Title VII and the ADEA]." Pub. L. 102-66, § 118 (reprinted in notes to 42 U.S.C. § 1981). As the Eighth Circuit noted, "the arbitrability of Title VII claims finds support in [§ 118 of] the Civil Rights Act of 1991." *Patterson v. Tenet Healthcare*, 113 F.3d 832, 837 (8th

22

Cir. 1997); *see also Austin v. Owens-Brockway Glass Container, Inc.*, 78 F.3d 875, 881 (4th Cir. 1996), *cert. denied*, 117 S.Ct. 432 (1996) ("The language of the [Civil Rights Act of 1991] could not be any more clear in showing Congressional favor towards arbitration."). Thus, it is clear from the text of § 118 that Congress did not intend to preclude arbitration of Title VII claims, but rather, explicitly encouraged the use of arbitration. *See Koveleskie v. SBC Capital Markets, Inc.*, 167 F. 3d 361, 365 (7th Cir. 1999); *see also Seus v. John Nuveen & Co., Inc.*, 146 F.3d 175, 183 (3rd Cir. 1998).

Furthermore, the Sixth Circuit has also noted the recognition by the United States Supreme Court that "by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *See Cosgrove v. Shearson Lehman Brothers*, 1997 WL 4783 (6th Cir. 1997) (unrp't) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). The Court held that "[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *See Cosgrove*, 1997 WL 4783 (6th Cir. 1997) (unrp't) (quoting *Gilmer*, 500 U.S. at 26 (citations omitted)). Here, the text of § 118, adopted by the full Congress,

23

declares that lawful "arbitration . . . . is encouraged to resolve disputes arising from [Title VII and the ADEA]." emphasis added). However, that declaration "simply cannot be 'interpreted' to mean that the FAA is impliedly repealed with respect to agreements to arbitrate Title VII and ADEA claims that will arise in the future." *Seus*, 146 F.3d at 182.

Put another way, it is "difficult to see why the purposes of Title VII present a stronger case for rejecting arbitration than do the purposes of either the ADEA or the ADA." *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1998 WL 880910, *9 (1st Cir. 1998). The Supreme Court in *Gilmer* "found no clash between arbitration and the purposes of the ADEA, noting instead that '[s]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.'" *Rosenberg*, 1998 WL 880910 at *9 (quoting *Gilmer*, 500 U.S. at 28) (citations omitted). Additionally, the First Circuit in *Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141, 150 (1st Cir. 1998) held that "[t]here is no reason to think that the ADA presents a stronger policy case against arbitration than [the] ADEA."

In this case, neither the language of the statute nor the legislative history demonstrates an intent in the 1991 Civil Rights Act to preclude a waiver of the right to a judicial forum. Since

24

there is no basis to conclude that compulsory arbitration of Title VII claims pursuant to an arbitration agreement would be inconsistent with the statutory framework and purposes of Title VII. Plaintiff Thomas' claims under Title VII and the 1991 Civil Rights Act are subject to arbitration.

## III. The right to a jury trial is waivable and therefore, not contrary to public policy

Plaintiff Thomas argues that she is entitled to a jury trial pursuant to the 1991 Civil Rights Act. Doc. 11, Pl. Memo Contra at 4. Plaintiff Thomas asserts that the remedies available to plaintiffs in pursuing Title VII claims under the 1991 Civil Rights Act were expanded to permit jury trials and therefore, such right cannot be nullified by compulsory arbitration. *Id.* at 4-5. Moreover, the right to a jury trial pursuant to the United States Constitution's Seventh Amendment is important and should not be denied under these circumstances. *Id.* at 5.

The Defendants assert that it has long been settled that the right to a jury trial is a waivable right. (Doc. 14, Def. Reply Memo at 5) (citing, *inter alia*, *Aetna Insurance Co. V. Kennedy*, 301 U.S. 389 (1937) and Fed. R. Civ. P. 38(d)). The Defendants also point out that the same Congress which enacted Title VII also enacted the FAA, which encourages the waiver of judicial remedies in favor of arbitration. *Id.* at 5-6.

25

This issue is properly resolved in *Gilmer* where the Supreme Court explicitly stated that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA. *Gilmer* 500 U.S. at 26. The Court stated that "by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)).

This intention, the Court stated, would be "discoverable in the text of the [statute], its legislative history, or an 'internal conflict' between arbitration and the [statute's] underlying purpose." *Id.* The Court urged, however, that it "should be kept in mind that 'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.'" *Gilmer*, 500 U.S. at 26 (quoting *Moses H. Cone Memorial Hospital v Mercury Construction Corp.*, 460 U.S. 1, 24 (1983)).

Therefore, Plaintiff Thomas' agreement to arbitrate claims under Title VII constituted a waiver of the right to a jury trial.

## IV. Sufficient consideration existed for the parties' agreement to arbitrate their disputes

Plaintiff Thomas next argues that there was no written statement of valuable consideration for her to enter into the arbitration policy nor was there any verbal consideration

26

expressed. Doc. 11, Pl. Memo Contra at 5). Plaintiff Thomas contends that her inducement for signing the arbitration policy validation form was the concern for not losing her job after being ordered to sign by her supervisor, Defendant Marsolc. Plaintiff Thomas further asserts that a promise made without consideration is a *nudum pactum* and is of no binding force. *Id.* (citing *Turnbull v. Brock,* 31 Ohio St. 649 (1877)).

The Defendants assert that the parties' mutual promises to arbitrate any disputes arising from the employment relationship constitute sufficient consideration to support the agreement. (Doc. 14, Def. Reply Memo at 6) (citing, *inter alia, O'Neil v. Hilton Head Hospital,* 115 F.3d. 272, 274-75 (4th Cir. 1997) (employer's and employee's mutual promise to arbitrate constituted sufficient consideration for arbitration agreement) and *Koon v. Hoskins,* 1996 WL 30018, slip op. at 4 (Ohio App. 4th Dist., Jan. 24, 1996) ("Consideration may be in a variety of forms, and among those recognized as sufficient to support a contract is the consideration of mutual promises . . .")). Furthermore, the Defendants argue that where an employee is at-will, like Plaintiff Thomas, continued employment constitutes sufficient consideration. *Id.* at 7 (citing, *inter alia, Sash and Storm, Inc. v. Thompson,* 1997 WL 784350, *2 (Ohio App. 3rd Dist., Dec. 22, 1997) (explaining that since an employer is not legally required to continue the employment of an

27

at-will employee, continued employment is sufficient consideration for a contract; and *Rupert v. Blue Cross/Blue Shield*, 1997 WL 89101 Ohio App. 8th Dist., Feb. 28, 1997)).

In analyzing the merits of both side's argument, Plaintiff Thomas' argument that there was no consideration given to her for agreeing to arbitrate fails because mutual promises were made. A mutual promise to arbitrate has been held to constitute sufficient consideration for an arbitration agreement. *See O'Neil v. Hilton Head Hospital*, 115 F.3d. 272, 274-75 (4th Cir. 1997), *citing Rickborn v. Liberty Life Insurance Co.*, 468 S.E. 2d 292, 300 (1996). Here, the agreement to be bound by arbitration was a mutual one, as stated in the Arbitration Policy. *See* Doc. 10, Memo of Def. Motion to Compel, at 4 ("Both the [CIGNA Healthcare] Division and the employee will be bound by any decision made by a neutral arbitrator."). Even though the contract to arbitrate was proffered by CIGNA, the employer, both parties would be bound by the arbitration process once Plaintiff Thomas, the employee, agreed. Since Plaintiff Thomas signed the Defendants' arbitration policy validation form, the mutual promises to arbitrate any disputes arising from the employment relationship constituted sufficient consideration to support the agreement. *See* Doc. 11, Thomas Aff. ¶9.

28

Moreover, where an employee is at-will, as in the case of Plaintiff Thomas, continued employment constitutes sufficient consideration under Ohio law, which this Court must follow in determining whether a binding agreement to arbitrate was consummated by the parties.[1] *See Copeco, Inc. v. Caley*, 91 Ohio App. 3d 474, 477, 632 N.E. 2d 1299, 1301 (Ohio App. 5th Dist., 1992), citing *Nichols v. Waterfield Financial Corp.*, 62 Ohio App. 3d 717, 719, 577 N.E. 2d 422, 423 (1989) (holding that continued employment was sufficient consideration to support the employment agreement). Since an employer is not legally required to continue the employment of an at-will employee, continued employment is consideration for a contract. *See Sash and Storm*, 1997 WL 784350 at *2. Consequently, "[a]s a practical matter every day is a new day for both employer and employee in an at-will relationship. . . [there is] no substantive difference between the promise of employment upon initial hire and the promise of continued employment subsequent to 'day one.'" *Copeco*, 91 Ohio App. 3d at 478. Therefore, in this case, Plaintiff Thomas' continued

---

[1]The Court is bound to follow Ohio law on this point; it is not bound to accept this view without criticism. In the Court's view, this is a harsh rule of law, not followed in many, if not most, states. e.g. Pemco v. Rose, 163 W. Va. 420, 257 S.E. 2d 885 (1979). Under this rule, the theory is that both parties agreed to terms; the employee agrees by simply returning to work under an at-will employment arrangement. Yet, the employer may change the agreement at any time. The employee may only reject these changes or purported agreements by quitting the employment. Were this Court at liberty to draw on a clean slate, it would hold that an agreement to arbitrate requires an agreement, not simply under Ohio law a return to work by an at-will employee.

29

employment, as an at-will employee, constituted sufficient consideration for the parties' agreement to arbitrate their employment-related disputes.

**V.    Plaintiff Thomas knowingly and voluntarily agreed to submit any employment-related disputes to arbitration**

Plaintiff Thomas argues that she did not know about the Defendants' arbitration policy when she began her employment with the Defendants nor was the arbitration policy a part of her initial employment agreement. (Doc. 11, Pl. Memo Contra at 6). Plaintiff Thomas contends that she never received the memos from the Defendants regarding the arbitration policy, dated July 25, 1995 and September 26, 1996. *Id.*

Furthermore, Plaintiff Thomas asserts that the first and only time she received a copy of the "Employee Handbook," which also references the arbitration policy, was approximately one week prior to September 29, 1998. *Id.* Plaintiff Thomas' position then, is that she could not and did not know the essential terms of the contract as they were not available to her at the time she signed the validation form (January 27, 1997). *Id.* Plaintiff Thomas' argument is based on the date appearing on the Arbitration Rules and Procedures document in the far left corner on the first page, which reads "1998 CIGNA Companies," and the statement on page 13 of the same document which reads ". . . revised 6/1/98." *Id.* From these notations, Plaintiff Thomas argues that the Arbitration Rules

30

and Procedures could not have been provided to her in January 1997 nor were even in existence at that time. *Id.* Furthermore, there was no explanation of the arbitration policy by her then supervisor Defendant Marsolo or by anyone from Human Resources. *Id.*

Significantly, Plaintiff Thomas asserts that the timing of the presentation of the arbitration policy was oppressive because by the time she was presented with the arbitration policy, she was already a victim of discriminatory treatment by Defendants. *Id.* In fact, on January 24, 1997, two or three days before she had even heard about Defendants' compulsory arbitration policy, she received a "Formal Notice" of discipline regarding a January 20, 1997 incident where she was accused of displaying unprofessional conduct during a discussion with Pharmacy Technician Carolyn Final. *Id.* Plaintiff Thomas contends that on January 27, 1997, the same day she signed the validation form for the arbitration policy, she sent a letter to the Speak Easy Coordinator regarding a formal complaint she had against her then supervisor Defendant Marsolo. *Id.* Thus, by January 27, 1997 Plaintiff Thomas was already involved in an employment dispute with the Defendants, which serves as a basis for the Complaint filed herein. *Id.*

The Defendants argue that they took steps to insure that all employees, including Plaintiff Thomas, were informed of the Arbitration Policy. (Doc. 14, Def. Reply Memo at 7). Such steps

31

included sending all employees a letter on July 25, 1995 informing them of the requirement to arbitrate disputes, a July 25, 1995 memorandum attaching a copy of the Arbitration Policy, and a September 16, 1996 memorandum attaching an updated copy of the Arbitration Policy. *Id.* In addition, CIGNA circulated a validation form attaching a copy of the Arbitration Policy, which Plaintiff Thomas signed on or about January 27, 1997, acknowledging her receipt of the policy. *Id.* at 7-8.

Based on the measures taken, the Defendants argue that Plaintiff Thomas cannot allege that she did not know the essential terms of the Arbitration Policy at the time she signed the validation form. *Id.* at 8. It is the Defendants' position that Plaintiff Thomas would have known those essential terms if she had merely read the policy attached to the validation form. When Plaintiff Thomas signed the validation form, however, regardless of whether she read the Arbitration Policy, she became bound by its terms. *Id.*

In support of their position, the Defendants cite Ohio law, which states that absent fraud or mutual mistake, a party who signs an agreement without making a reasonable effort to know its contents, cannot avoid the effect of the agreement. *Id.* (citing *Pippin v. M.A. Hauser Enterprises, Inc.*, 676 N.E. 2d 932, 937, 111 Ohio App. 3d 557 (Ohio App. 6th Dist. 1996); *Hughes v. Cardinal*

32

*Federal Savings and Loan Assn.*, 866 F. Supp. 134, 144 S.D. Ohio 1983); *Nahra v. Honeywell, Inc.*, 892 F. Supp. 962, 972 (N.D. Ohio 1995). Therefore, Plaintiff Thomas cannot now renege on the representation she made when signing the validation form merely because she did not read the attached Arbitration Policy. *Id.*

In response to Plaintiff Thomas' claims that she had not seen the employee handbook, which restates the terms of the Arbitration Policy, the Defendants assert that the handbook's recitation of the policy does not embody any new or different terms. *Id.* Since the terms of the Arbitration Policy, set forth in both the employee handbook and a separate policy statement, are consistent, CIGNA's production of the policy to Plaintiff Thomas at different times does not cancel her obligation to arbitrate. *Id.*

Here, Plaintiff Thomas was clearly made aware of the existence of the Arbitration Policy, which required any employment disputes to be arbitrated. *Id.* Therefore, the Defendants argue that by signing the validation form and continuing her employment with CIGNA, Plaintiff Thomas "knowingly" agreed to the terms of the Arbitration Policy. *Id.*

With respect to Plaintiff Thomas' arguments concerning the date-notations on the Arbitration Rules and Procedures documents, the Defendants contend that the CIGNA Arbitration Rules and Procedures had been in effect since approximately July 1995. *Id.*

33

at 9-10. Although CIGNA issued different versions of the Arbitration Rules from time to time, a copy of the rules for employees to review was always maintained. *Id.* at 10. Moreover, the Arbitration Policy attached to the validation form signed by Plaintiff Thomas states that "[a]n employee may obtain a copy of the Arbitration Rules and Procedures from a human resource representative at any time." *Id.* Therefore, if Plaintiff Thomas did not review the Arbitration Rules and Procedures, it was only because she never requested a copy. *Id.*

Furthermore, the Defendants assert that Plaintiff Thomas' claim that the negotiations were not between "equally-astute business entities" contradicts the intent of the FAA and the holdings in *Cosgrove, Asplundh,* and *Willis, supra,* and from numerous other circuits cited in sections I and II above. *Id.* Additionally, Ohio law states that:

> While an employment relationship may by definition result in an employer having a slightly better bargaining position than an employee, this disparity in bargaining power is inherent in the relationship and is not sufficient to render a contract unenforceable absent a showing of duress, misrepresentation, fraud, illegality, or other improper action.

*Id.* at 10-11 (citing *Midwest Paper Specialties Co. v. Holler,* 1995 WL 326377, *3 (Ohio App. 6th Dist., 1995), *citing Hilb, Rogal & Hamilton Agency v. Reynolds,* 610 N.E. 2d 1102, 1107, 81 Ohio App. 3d 330, 337 (Ohio App. 2d Dist. 1992)).

34

In response to Plaintiff Thomas' claims that her signing of the validation form was not voluntary and was oppressive, the Defendants assert that Plaintiff Thomas cannot identify any specific acts or statements by Defendants that were coercive other than her own unsubstantiated "fear" that if she did not sign the validation form, she would be disciplined further. *Id.* at 11. Moreover, the Defendants claim that CIGNA's implementation of the Arbitration Policy was not sprung on Plaintiff Thomas in January 1997 because it had been in effect since July 1995, at which time it had been distributed to all employees.

Plaintiff Thomas knowingly and voluntarily agreed to submit any employment related disputes to arbitration. As the Defendants correctly point out, under Ohio law, "[e]very person is obliged to read a contract before signing it and, in the absence of fraud or mistake, or some other reason requiring equitable relief, is held to the terms of the agreement signed." *Hughes*, 566 F. Supp. at 844, *citing*, *inter alia*, *Independent Directory Corp. v. Vandenbrock*, 94 N.E. 2d 228, 43 Ohio Op. 229 (Appeals 1950), *rehearing denied*, 94 N.E. 2d 529, 43 Ohio Op. 232 (Appeals 1950). Assuming arguendo, that Plaintiff Thomas never received a copy of the employee handbook at the time she began her employment and that she never received any of the three memos dated July 25, 1995 (two of them) and September 26, 1996 regarding the Arbitration Policy,

35

she still had knowledge or should have had knowledge about the policy at the time she signed the validation form.

When the validation form was sent around for all the employees to sign, attached to it was a three page summary of the Arbitration Policy, which stated in fairly clear terms under the heading "STATEMENT OF POLICY" that " . . . arbitration by a neutral third-party is the required and final means for the resolution of any serious disagreements and problems not resolved by the Division's internal dispute resolution processes." *See* Doc. 11, Pl. Memo Contra, Ex.2 at 1. On page two of the summary under the heading "SCOPE OF THE ARBITRATION POLICY", it states that "[t]his policy covers only serious employment-related disagreements and problems, . . . [s]uch serious disputes include claims, demands or actions under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, [and] the Civil Rights Act of 1991, . . ." *Id.* at 2. On page three of the summary under the heading "STARTING THE ARBITRATION PROCEDURE," it states that "[a]n employee may obtain a copy of the Arbitration Rules and Procedures from a human resource representative *at any time.*" *Id.* at 3 (emphasis added).

Thus, by merely glancing at the three page summary, Plaintiff Thomas would have known the essential terms of the Arbitration Policy. Plaintiff Thomas would have also known, had she read the attached Arbitration Policy summary, that she could obtain a copy

36

of the Arbitration Rules and Procedures at any time from a human resource representative if she wanted more information. However, since Plaintiff Thomas chose to sign the validation form, which stated "[p]lease complete this form to show that all employees . . . have received a copy of the Mediation/Arbitration Policy," without informing herself as to what she was agreeing to, she should be held to her obligation to arbitrate. *See* Doc. 10, Def. Motion to Compel, Ex. A-6.

As stated in *Hughes*, "if the parties have signed a written agreement, it is presumed that their minds have met and a contract made, even if one of the parties failed to read the agreement. *Hughes*, 566 F. Supp. at 844, *citing Parklawn Manor v. Jennings-Lawrence Co.*, 197 N.E. 2d 390, 26 Ohio Op. 2d 341, 344 (1962). Moreover, it has been determined that "even in cases where the person seeks to avoid the effect of the contract by citing ignorance of the contract's contents or a failure to understand those contents," such an assertion is insufficient to escape the effect of the agreement. *Pippin*, 676 N.E. 2d at 937, 111 Ohio App. 3d at 564, *citing*, *inter alia*, *Muskovitz v. Sun Underwriter's Agency of Sun Ins. Co.*, 3 Ohio App. 422, 424 (1913).

The fact that Plaintiff Thomas alleges that she never received the employee handbook, which references the Arbitration Policy, is immaterial because that is not the only place where the Arbitration

37

Policy could be examined. Not only were three memos sent out to all employees regarding the Arbitration Policy, but a copy of a summary of the policy was attached to the validation form for her review. Therefore, Plaintiff Thomas' claim that she was unaware of the essential terms of the Arbitration Policy is without merit.

Furthermore, Plaintiff Thomas' arguments regarding the date-notations on the bottom of the Arbitration Rules and Procedures is frivolous. The CIGNA Arbitration Rules and Procedures had been in place since approximately July 1995 when CIGNA first issued the Arbitration Policy. *See* Doc. 10, Def. Motion to Compel, Ex. 5. The fact that CIGNA *revised* the Arbitration Rules and Procedures only shows more so that such rules and procedures were already in existence.

Moreover, an affidavit, attaching copies of the CIGNA Arbitration Rules and Procedures, from CIGNA's Administrator of CIGNA Companies Alternative Dispute Resolution Programs shows that the Arbitration Rules and Procedures were in effect at various times. *Id.* Although Cigna issued revised versions of the Arbitration Rules from time to time, a copy of the rules was always maintained for employees to review. *Id.* Therefore, based on the existence of the Arbitration Rules and Procedures at the time of the signing of the validation form and the lack of any effort or intent to conceal the contents of the rules, Plaintiff Thomas'

38

argument that she did not know the essential terms of the Arbitration Policy fails.

In the present case, not only does the Arbitration Policy summary explicitly state on page two that "[t]his policy covers only serious *employment-related* disagreements and problems," but it also spells out in clear terms that "[s]uch serious disputes include claims, demands or actions under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, [and] the Civil Rights Act of 1991, . . ." *See* Doc. 11, Pl. Memo Contra, Ex.2 at 2 (emphasis added). Thus, Plaintiff Thomas was "aware that statutory and constitutional claims, as well as contractual ones, [were] subject to arbitration." *Cosgrove*, 1997 WL 4783 (6th Cir. 1997) (unrp't).

Furthermore, Plaintiff Thomas' claim that the Arbitration Policy was presented to her after she had already been subjected to discrimination on or about January 24, 1997 is unpersuasive. The alleged discriminatory conduct was Plaintiff Thomas' receipt of a disciplinary notice accusing her of displaying unprofessional conduct. *See* Doc. 11, Thomas Aff. ¶5&6. The Arbitration Policy had been in effect since July 1995. Thus, the Arbitration Policy was not devised suddenly to deal with Plaintiff Thomas' situation, but instead, had been openly in place for almost two years.

39

Therefore, Plaintiff Thomas knowingly and voluntarily agreed to submit any employment-related disputes to arbitration.

## VI. The Arbitration Policy clearly applies to Plaintiff Thomas' claims

Plaintiff Thomas argues that pursuant to its own terms, the Arbitration Policy is not applicable because the "policy does not cover, among other things: . . . the decision to create, fill or eliminate position(s)." (Doc. 11, Pl. Memo Contra at 10, *citing* Ex.2 at 2) (emphasis added). Since one of the actions about which Plaintiff Thomas complains is the filling of the Pharmacy Supervisor position, Plaintiff Thomas argues that the Arbitration Policy is not applicable to the issue nor should it be to any other cause of action set forth in the Complaint. (Doc. 11, Pl. Memo Contra at 10, *citing* Complaint ¶17-21).

The Defendants argue that the language cited by Plaintiff Thomas is misleading because she omitted an important qualifying phrase. (Doc. 14, Def. Reply Memo at 13). When put in context, the Arbitration Policy actually reads as follows:

> [C]laims, demands or actions under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, [and] the Civil Rights Act of 1991 . . .
>
> \* \* \*
>
> **Unless a disagreement or dispute about any of the following involves an allegation that a specific federal, state or local law has been violated, this policy does not cover, among**

40

other things:

\* \* \*

   • the decision to create, fill or eliminate
   position(s).

*Id.* (citing Doc. 10, Def. Motion to Compel, Ex. A-5 at 2) (emphasis added).

   Thus, the Defendants argue that the Arbitration Policy clearly applies to Plaintiff Thomas' Complaint. *Id.* Failure to promote an employee, whether under federal or state statutes or common law, is based on an alleged violation of Title VII. *Id.*

   Upon examining the Arbitration Policy, the plain language clearly dictates that the policy applies to Plaintiff Thomas' complaint.

### CONCLUSION

   Based on all of the foregoing, the Defendants' **Motion** to Compel Arbitration is granted. This case is therefore **DISMISSED** and the parties are **ORDERED** to submit the plaintiff's claims to binding arbitration.


9. 30-99
DATE

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE


41